UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK     **FJS / GHL**

JOSE RODRIGUEZ,

                    Plaintiff,

v.

GLENN S. GOORD, Personal-Individual Capacities, and
as Commissioner for New York State Department of Cor-
rectional Services; THOMAS G. EAGEN, Personal-Indi-
vidual Capacities, and as an Inmate Grievance Program
Director for New York State Department of Correctional
Services; HOWARD DEAN, Personal-Individual Capacities,
and as a Director of Inmate Industry Cook-chill for New
York State Department of Correctional Services; KEVIN
DOE, Personal-Individual Capacities, and as a Food Ad-
ministrator Supervisor of Inmate Industry Cook-chill for
New York State Department of Correctional Services;
BOBBY LADIN, Personal-Individual Capacities, and as a
Food Administrator Supervisor of Inmate Industry Cook-
chill for New York State Department of Correctional Ser-
vices; NICK GUIDO, Persona-Individual Capacities, and
as a Food Administrator Supervisor of Inmate Cook-chill
for New York State Department of Correctional Services;
RALPH FANDERIO, Personal-Individual Capacities, and
as a Food Administrator Supervisor of Inmate Industry
for New York State Department of Correctional Services;
MARA DOE, Personal-Individual Capacities, and as a
Medical Doctor of Oneida Correctional Facility for New
York State Department of Correctional Services; DESTITO
DOE, Personal-Individual Capacities, and as a Medical
Nurse of Oneida Correctional Facility for New York State
Department of Correctional Services; BURDICK DOE, Per-
sonal-Individual Capacities, and as a Medical Nurse of
Oneida Correctional Facility for New York State Depart-
ment of Correctional Services; JOHN AND JANE DOES,
(1-25) Personal-Individual Capacities, and in their office
they hold for New York State Department of Correctional
Services;

                    et al.,

                    Defendant(s).

Civil Action No.


0  - - - - 8

**TRIAL BY JURY DEMAND**

**1983    CIVIL    ROGHTS
COMPLAINT**



U.S. DISTRICT COURT - N.D. OF N.Y.
**FILED**
MAR 3 0 2004
AT_____ O'CLOCK
Lawrence K. Baerman, Clerk - Syracuse

## A.
## INTRODUCTION

1.    This is an action for money damages brought pursuant to

42 U.S.C. §§ 1983; 1985 and 1986, and the Eighth and Fourteenth

Amendments to the United States Constitution, and under the laws

of the United States and State of New York, against Glenn S. Goord,

Thomas G. Eagen, Howard Dean, Kevin Doe, Bobby Ladin, Nick Guido, Ralph

Fanderio, Mara Doe, Destito Doe, Burdick Doe, and John and Jane Does (1-25), in their personal-individual capacities, and under their office they hold as employee's for New York State Department of Correctional Services. ("DOCS").

## B.

## JURISDICTION

2.   This Court has jurisdiction over the claim's herein pursuant to 28 U.S.C. §§ 1331 and 1343(a)(1),(2) & (3), and 28 U.S.C. § 1367, based upon pendent/supplementary jurisdiction to entertain claims arising under state law.

## C.

## VENUE

3.   This Court has venue over this cause of action pursuant to 28 U.S.C. §§ 112(a) and 1391(b), because the events that gave rise to this suit occurred in the Northern District of New York.

## D.

## PARTIES

4.   Plaintiff, Jose Rodrguez ("Mr. Rodriguez") is and was, at all times relevant hereto, a prisoner in the custody of the State Department of Correctional Services ("DOCS") for New York. At the time of the events relevant hereto, Mr. Rodriguez was confined at DOCS Oneida Facility ("Oneida"), located at: 6100 School Road, Rome, New York, where he is currently incarcerated.

5.   Defendant Glenn S. Goord ("Goord") is and was, at all times relevant hereto, the Commissioner of DOCS Oneida invested with the duty, obligation, and responsibility to ensure that individuals confined at Oneida are provided with care and protection from un-warranted harm.

2.

**6.**    Defendant Thomas G. Eagen ("Eagen") is and was, at all times relevant hereto, the Grievance Program Director for New York State Department of Correctional Services.

**7.**    Defendant Howard Dean ("Dean") is and was, at all times relevant hereto, the Director of Oneida Cook-chill Industry ("Cook-chill"), invested with the durty, obligation, and responsibility to ensure the safty of inmates working at Cook-chill, and to provide them with proper trianing to perform their jobs.

**8.**    Defendant Kevin Doe ("Kevin") is and was, at all times relevant hereto, a Food Administrator Supervisor ("Supervisor") of the Oneida Cook-chill, invested with the duty, obligation, and responsibility to ensure the safty of inmates working at Cook-chill, and to provide them with proper training to perform their jobs.

**9.**    Defendant Bobby Ladin("Bobby") is and was, at all times relevant hereto, a Supervisor of the Oneida Cook-chill, invested with the duty, obligation, and responsibility to ensure the safty of inmates working at Cook-chill, and to provide them with proper trianing to perform their jobs,

**10.**    Defendant Nick Guido ("Nick") is and was at all times relevant hereto, a Supervisor of the Oneida Cook-chill, invested with the duty, obligation, and responsibility to ensure the safty of inmates working at Cook-chill, and to provide them with proper training to perform their jobs.

**11.**    Defendant Ralph Fanderio ("Fanderio") is and was, at all times relevant hereto, a Supervisor of the Oneida Cook-chill, invested with the duty, obligation, and responsibility to ensure the safty of inmates working at Cook-chill, and to provide them with proper training to perform their jobs.

12.   Defendant Mara Doe ("Mara") is and was, at all times relevant hereto, a Medical Doctor of Oneida Medical Department, invested with the duty, obligation, and responsibility to care, and provide medical treatment to inmates confined at Oneida.

13.   Defendant Destito Doe ("Destito") and Defendant Burdick Doe ("Burdick") are and were, at all times relevant hereto, Medical Nurses of the Oneida Medical Department, invested with the duty, obligation, and responsibility to care and provide medical treatment to inmates confined at Oneida.

14.   Defendants John and Janes Does ("Does") one through twenty-five, are and were, at all times relevant hereto, either a Superintendent, Captain, Lieutenant, Sergeant, Officer, or civilian, invested with the duty, obligation, and responsibility, to provide medical care, standard care, protection, and safty to inmates confined at Oneida, and/or to provide training to inmates working at Cook-chill, so that they could properly and saftly perform their jobs.

E.

BACKGROUND AND FACTS

15.   Mr. Rodriguez realleges and incorporates by reference all proceeding paragraphs 1 through 14 as if they were fully restated herein.

16.   On or about May 10, 2003, Mr. Rodriguez was assigned, as part of a program work policy implimented by Commissioner Goord, to work at Cook-chill.

17.   On May 15, 2003, at approximately 9:00 O'clock of that morning, while at Cook-chill, Mr. Rodriguez was instructed by Nick,

4.

(Food Administrator Supervisor), to lift heavy containers/lugs, weighing approximately 150 to 175 lb. each, for the purpose of emptying the contents into large kettles that stood at approximately five (5') feet in height from the ground up.

18. At that time, when Mr. Rodriguez started to do as instructed, he immediately felt a pinch in his lower back area.

19. Simultaneously with feeling the pinch, Mr. Rodreguez also felt pain shoot into his hip and testicle areas of his body.

20. Immediately while feeling the pain, Mr. Rodreguez advised another Food Adminstrator Supervisor, Bobby, who was also present at the time, about the unwanted pains.

21. After Bobby learned of the injury, he escorted Mr. Rodriguez to an officer's station.

22. Once at the nearby officer's station, Mr. Rodriguez began to explain to the acting officer about what had happened, and advised the officer of the severity of the excruciating pain that he was expirencing.

23. The officer immediately contacted the Medical Department within the facility about the matter, and made arrangements to have Mr. Rodriguez transported into the facility to be seen by Medical Personal.

24. Upon arriving to the Medical Department, Mr. Rodriguez was seen by Doctor Mara.

25. Mr. Rodriguez explained to Dr. Mara what had happened, and advised him that he was expirencing a high level amount of pain.

26. Despite the facts of what Mr, Rodriguez had told Dr. Mara about the incident, and advising him about the severe pain he was feeling in his lower back, right hip, and testicles, Dr. Mara conducted

no examinations of Mr. Rodriguez persons.

27.  Dr. Mara simply gave Mr. Rodriguez a medical excuse for two days off from work. It also indicated that he was not to do any heavy lifting. Additionally, he gave Mr. Rodriguez a few packets of Ibuprofen for the pain, and sent him away.

28.  On May 20, 2003, when Mr. Rodriguez returned to work, he showed the medical excuse/permit to Supervisor Nick, that advised that he was not to do any heavy lifting.

29.  Supervisor Nick responded "stop your bullshit, there is nothing wrong with you".

30.  Supervisor Nick then proceeded to pull some containers/lugs towards the kettles, and instructed Mr. Rodriguez to give him a hand with them, stating "we have a lot of work to do," so come on.

31.  Mr. Rodriguez replied by advising that he was still in a severe amount of pain, and that he was not to lift anything heavy, as indicated on the medical excuse/permit.

32.  Supervisor Nick at that moment threaten Mr. Rodriguez that if he did not obey his direct order and begin to lift the containers/ lugs and empty them into the kettles, he would write him an infraction ticket for disobeying a direct order.

33.  To avoid receiving an infraction ticket, and being placed in solitary confinement for refusing to work, Mr. Rodriguez did as he was told, despite the fact that he was suffering a severe amount of pain.

34.  On May 21, 2003, during the early morning hours while Mr. Rodriguez was asleep in his housing unit, an officer came by his bed to wake him up for work.

6.

35. Once Mr. Rodriguez was awaken by the unit officer, he advised the officer that he was feeling severe excruciating pain, and that he could barely move. Mr. Rodriguez then requested to see someone from the medical department about the matter.

36 The officer responded to Mr. Rodriguez by telling him that "it was to late for sickcall" as the officer had already turned in the slip.

37. The officer continued by telling Mr. Rodriguez that he needed to stop complaining and just go to work, otherwise he would have to place him in solitary confinement for refusing his program.

38. On May 21, 2003, Mr. Rodriguez accordingly reported to work at Cook-chill.

39. Upon arrival at work, Mr. Rodriguez was approached by Supervisor Nick, and instructed to begin lifting fifty-five (55) gallon drums of tomato paste, that weighed over 200 lb each.

40. Mr. Rodriguez then showed Supervisor Nick the medical permit again that exempt him from having to lift anything heavy, and advised him that he was still experiencing a severe amount of pain.

41. Supervisor Nick again threatened Mr. Rodriguez with an infraction ticket if he did not commence work immediately.

42. Mr. Rodriguez bagan to perform work in the best possible manner he could, while in pain.

43. While Mr. Rodriguez was attempting to do his job, he accidentally fell into a treanch that had been left uncovered.

44. When Mr. Rodriguez fell into the trench, he landed on his tail bone area of his body and began to scream, as he was feeling a tremendous amount of pain to his lower back area that had been injured on May 15, 2003.

7.

45.   Mr. Rodriguez, while in pain in the trench, was asked by a civilian cook if he was alright, and Mr. Rodriguez replied by informing the civilian that he was expirencing excruciating pain, that his legs were feeling numb, that both his feet were feeling cold, and that he could hardly feel his right foot.

46.   The civilian immediately responded by telling Mr. Rodriguez, "do not worry, I saw what happened, you need to see someone from medical, do not move, I will get help."

47.   Mr. Rodriguez was subsequently transported to the medical department where he was seen by Nurse Destito.

48.   Nurse Destito (recognizing Mr. Rodriguez from being seen on May 15, 2003) stated to Mr. Rodriguez, "you were just seen by the doctor (Mara) last week." "Your alright, you Cook-chill workers are  always making up lies to get out of work, I am going to send you to your housing unit."

49.   Mr. Rodriguez attempted to explain to Nurse Destito what had happened, and that he was in more pain then, then he was from the incident that took place on May 15, 2003.

50.   Despite what Mr. Rodriguez was telling Nurse Destito, she told him that there was no need to see a doctor, and that he could go back to his housing unit.

51.   Mr. Rodriguez accordingly, without any examinations being conducted by any medical personal, left with servere pain and headed back to his housing unit.

52.   Once he finally arrived at the unit and began to attempt to make his way to the third floor, the pain became so severe by the time he reached the second floor level, that other inmates had to provide him with assistance to make it the rest of the way.

53.   On June 9, 2003, the pain had become so severe, that Mr. Rodriguez decided to attempt to see a doctor by signing up for medical sickcall.

54.   Mr. Rodriguez was seen that day in the morning hours, but without examination, he was turned away and told that he would be placed on the list to see a facility doctor.

55.   On June 10, 2003, Mr. Rodriguez was awoken feeling severe excruciating pain, expirencing numbness in his legs, and no feeling in his right foot.

56.   The housing officer was alerted to the situation. Thereafter, the officer placed Mr. Rodriguez on an emergency sickcall slip to see a doctor.

57.   That morning, when Mr. Rodriguez arrived at the medical unit, he was seen by the Oneida head physician, Doctor Pickles. Upon examination, Dr. Pickles could see that something was wrong, and immediately ordered an X-Ray for further examination.

58.   Once the X-Rays were completed, and examined by Dr. Pickles, he explained to Mr. Rodriguez that there were serious injuries, some permanent damage, and that he was going to admit him to the facility medical ward for further treatment.

59.   Mr. Rodriguez, after being admitted to the facility ward, was administered Darvocet and Robaxin for pain and to relax him. He was also placed on total bed rest.

60.   On June 17, 2003, Mr. Rodriguez was subsequently released from the facility medical ward, and given a medical permit exempting him from all lifting activities.

61.   On June 18, 2003, Mr. Rodriguez reported to work at Cook-chill.

62.   Upon arriving at work, Mr. Rodriguez presented to Supervisor

9.

Bobby, the medical permit restricting him from lifting anything heavy.

63.     Despite the fact that Mr. Rodriguez had showed Supervisor Bobby the medical restriction, he was directed to begin lifting lugs/ containers once again.

64.     During the course of working under direct order, at one point and time, he attempted to take a break from the lifting, because the pain was so severe that he was to the point that he could not bare to stand on his feet any longer.

65.     When Mr. Rodriguez attempted to take a break, another Supervisor, Deecher shouted at him stating "I am the boss and you are an inmate, therefore you will do what I tell you, and that is get back to work NOW, there are no breaks."

66.     Deecher also wrote Mr. Rodriguez a misbehavior report for taking the break.

67.     Mr. Rodriguez, coupled with the pains he was having to endure from his injuries that he sustain on the 15th and 21st of May of 2003, became emotionally distressed due to the blind eye's and deaf ears that Supervisors Kevin, Nick, Bobby, Deecher and Franderio had been giving to the numerious medical restriction passes as they all were continually forcing him to perform a job that he was physically incapable of performing, and due to the infraction misbehavior report that Deecher had written when Mr. Rrodriguez had attempted to only take a break to relieve pain that the job was causing.

68.     Thereafter, Mr. Rodriguez was instructed by Supervisor Franderio to work the kettle department with no assistance.

69.     As Mr. Rodriguez attempted to do as instructed (to avoid any further misbehavior reports) a Cook went to find him some help.

10.

70.    Mr. Rodriguez struggled to do his job while enduring the unwanted pains.

71.    On July 15, 2003, Mr. Rodriguez, once again, after the pain had become so severe that he could not endure it any longer was admitted to the Oneida facility medical ward where he was given Perocet for the pain.

72.    After the medicine had been administered, and Dr. Pickles had become cognizant that it was not providing any relief, he scheduled Mr. Rodriguez for a Megnetic Resonance Imaging ("MRI") appointment at an outside hospital.

73.    On July 25, 2003, Mr. Rodriguez was discharged from the facility medical ward, despite the fact that he was still in excruciating pain. With the discharge, he was once again given a medical restriction pass from lifting anything.

74.    On August 22, 2003, Mr. Rodriguez was transported to the Sunny Upstate Medical University Hospital ("Hospital") for the MRI exam.

75.    After the exam had taken place, a medical report of findings was issued that revealed that there was severe damage to several disc', inasmuch as, there was bilateral paracental disc protrusions and desiccation of the intervertebral disc spaces. The report further showed degenerative changes caused by hypertrophy of the posterior facets, due to the other damages caused to the other various disc'.

76.    Once Mr. Rodriguez had been returned to the Oneida facility, he was required to report back to his work assigned Cook-chill program.

11.

77.     Upon reporting to work, he showed Supervisor Fanderio
and Kevin the MRI results.  Both Fanderio and Kevin told Mr. Rodriguez
that all they could do at that time would be to reassign him to the
meet room, but even there he would be required to lift and stand on
his feet.

78.     Mr. Rodriguez realizing that Supervisors Fanderio and
Kevin were still requiring him to lift and stand, approached another
Supervisor, John, about the situation.

79.     After Mr. Rodriguez explained to John that he could not
stand or lift anything, because of the amount of pain such activities
caused him to experience, he was advised to discuss the matter again
with Supervisor Fanderio.

80.     Fanderio, after discussing the matter with Mr. Rodriguez
informed him that there was another inmate who was being paroled
soon, and that once he was, he could have his job in the inmate
kicten area.

81.     Subsequently thereafter, Mr. Rodriguez was assigned to
the new job in the kitchen.

82.     Thereafter, in the middle of November, 2003, Director
of Cook-chill, Dean, issued a memoranda making it mandatory for all
inmates to work ten (10) hour days.

83.     Due to the new memo policy, on November 20, 2003, Mr.
Rodriguez reported to the Oneida facility medical department due
to having an increase in the level of pain, because of the new ten
(10) hour shifts that had been recently implimented by Director Dean.

84.     Nurse Burdick called Mr. Rodriguez into an interview
medical room, and advised him that there was nothing that she or any-

12.

one else could do to get him out of his assigned work program at Cook-chill, and therefore, he would have to continue to report to work.

85.    Nurse Burdick provided no medical care to Mr. Rodriguez at the time of the interview.

86.    Mr. Rodriguez then reported to work.  Once he arrived to his work program, he advised a Supervisor that he was still in a severe amount of pain, and that he did not know what to do.

87.    Mr. Rodriguez was subsequently sent back, by the Supervisor, to the medical department.  After returning to the Oneida medical department, Mr. Rodriguez was subsequently admitted to the medical ward on November 20, 2003, where he remained until on or about January  28, 2004.

88.    On January 7, 2004, while in the medical ward, Mr. Rodriguez was seen by a Orthipedic Specialist, Thomas Smallman, who after conducting an examination of Mr. Rodriguez, determined that he had, in additiona to other injuries, a severe sprianed back, which amounted to a permenent injury.

89.    Thereafter, when Mr. Rodriguez was discharged on January 28, 2004, with no idication that he would be receiving any type of meaningful treatment for his severe conditions that had been determined by two different outside sources (¶'s 74-75; 88 supra), he became deeply distraught and depressed over the matter. In an attempt to get intervention, he wrote two letters, the first to Commissioner Goord, and the second to Dean, the Director of Cook-chill. In both letters, he explained he had injuries, how he obtained them, that he was being denied medical care, and amoung other things, how he was being treated with abuse.

90.     Mr. Rodriguez concluded both of those letters by asking both Goord and Dean to provide whatever assistance they could to have the abusive treatment stopped, and to have medical care provided.

91.     Mr. Rodriguez received no responses from either Goord or Dean.

92.     Mr. Rodriguez then filed a grievance about the situations that he had been encountering since May 15, 2003 forward.

93.     The grievance was denied at the Oneida facility level.

94.     Mr. Rodriguez then appealed the denial the Albany Inmate Grievance Program Director, Eagen.

95.     By report issued December 26, 2003, Director Eagen denied the grievance appeal on the basis that he felt that Mr. Rodriguez was receiving all due medical tratement that he was entitled to under policy.

96.     Director Eagen also noted that the greivance process could not be used to support any adversary process that may ensue.

97.     At no time from when Mr. Rodriguez was assigned to the Cook-chill work program (¶ 16, supra) until termination of that job, was he ever provided with any training to perform any of the required jobs expected of him to perform.

98.     At no time during the time frame referenced in the proceeding paragraph, was Mr. Rodriguez ever provided with any safty equipment, such as a back brace, or anything alike, during the course of performing the jobs required of him while working at his assigned work Cook-chill program.

99.     During the term of incarceration that Mr. Rodriguez is currently serving, at no time has he ever complained of any type of

14.

injuries, until May 15, 2003, when he was first injured.

**100.** At all times, Mr. Rodriguez has maintained a blemish free institutional record, excluding the infraction report that was received for trying to take a break to ease unwanted pain.

**101.** Since the time of the first injury, May 15, 2003, due to the callous indifferent treatment, Mr. Rodriguez has suffered unwanted pain, mental distress, and interference with living in the setting of an incarcerated environment.

**102.** At all times relevant hereto, the defendants were clothed with authority, while acting under color of state law.

**103.** At all times relevant hereto, the defendants knew or should have known that their conduct was contrary to clearly established law.

## AS AND FOR A FIRST CAUSE OF ACTION

**104.** Mr. Rodriguez ("Plaintiff") repeats and realleges each and every allegation contained in paragraphs 1 through 103 above, as they were more fully restated herein.

**105.** At all times relevant prior to the injuries that Mr. Rodriguez suffered from on May 15, 2003, forward, he enjoyed an excellent reputation in the prison community for following all institutional rules, directives, and regulation, that was reflected by a blemish free institutional record.

**106.** At all times relevant prior to the injuries that Mr. Rodriguez suffered, he enjoyed an active life in participating in outdoor sports and other phsical events, with a high spirited life free of depression and feelings of neglect.

15.

107.    Defendants Doctor Mara, exercised deliberate indif-
ference to Mr. Rodriguez health and safty by failing to provide
adequate medical care to him after being advised by Cook-chill
employee's and himself of the incident that took place on May
15, 2003, as well as failing to provide any adequate care at any
time thereafter.

108.    Defendant Doctor Mara intentionally, voluntarily, and
wilfully refused to conduct any physical examinations after the
incident took place, or at any time thereafter, nor did Mara take
any reasonable steps to contact any other physcian about the matter
to provide Mr. Rodriguez with adequate medical care and/or attention.

109.    Instead, Defendant Doctor Mara, without providing any
care or conducting any examinations, disbelieved and mocked Mr.
Rodriguez and sent him away with no treatment.

110.    As a result of Defendant Doctor Maras' deliberate
indifference to Mr. Rodriguez condition, Mr. Rodriguez suffered
further unwanted pain, mental anguish, and his condition grew
worse, as a result of Doctor Mara sending him back to work.

111.    As a result of the foregoing, Doctor Mara violated
Mr. Rodriguez constitutional and civil rights, as enumerated under
both constitutions for the United States and the State of New York,
thus subject to redress under 42 U.S.C. §§ 1983 and 1986.

112.    As a result of the foregoing, Mr. Rodriguez has suffered
damages in an amount to be determined by a jury.

## AS AND FOR A SECOND CAUSE OF ACTION

113.    Plaintiff repeats and realleges each and every allega-
tion as set forth in paragraphs 1 through 112 above, as if they were

16.

more fully restated herein.

114.    Defendants Nurse Destito and Nurse Burdick, exercised deliberate indifference to Mr. Rodriguez health and safty when they failed to provide adequate medical care to him after learning on May 15, 2003 of his injuries, and more specifically, on May 21, 2003, when Nurse Destito was assigned to treat Mr. Rodriguez, but failed to do so, and when Nurse Burdick, on November 20, 2003, also failed to provide Mr. Rodriguez with any medical care, when assigned to treat him.

115.    Both Defendants, Nurse Destito and Nurse Burdick wilfully, intentionally, and voluntarily, have refused to provide Mr. Rodriguez with any reasonable and/or adequate medical treatment at any other time, until this very hour, when having been confronted by assign- ment to treat Mr. Rodriguez for his injuries.

116.    Instead, both Defendants Destito and Burdick, when assigned to treat Mr. Rodriguez, rather then provide him with any treatment, they both have mocked him with callous remarks.

117.    As a result of the deliberate indifference of both Nurse Destito and Burdick, to the rights of Mr. Rodriguez, Mr. Rodriguez has suffered further unwanted pain, mental anguish, and his condition has grown worse, as a result of their failures to take reasonable steps to provide care.

118.    As a result of the foregoing, Nurse Destito and Nurse Burdick have violated Mr. Rodriguez' constitutional and civil rights, as enumerated under both constitutions for the United States and the State of New York, thus subject to redress under 42 U.S.C. §§ 1983 and 1986.

17.

119.    As a result of the foregoing, Mr. Rodriguez has suffered damages in an amount to be determined by a jury.

## AS AND FOR A THIRD CAUSE OF ACTION

120.    Plaintiff repeats and realleges each and every allegation as set forth in paragraphs 1 through 119 above, as if they were more fully restated herein.

121.    Defendants Fanderio,Nick, Bobby, and Kevin, all exercised deliberate indifference to Mr. Rodriguez's health and safty, by failing to provide him with proper training to perform his jobs which caused, without such training permenent injury to his person, and by failing to honor medical exemption passes, when forcing him to perform jobs that the medical exemption passess were issued to prohibit.

122.    As a result of their wilfull, intentional, and voluntary actions and deliberate indifference to the medical injury conditions known to each of them, Mr. Rodriguez suffered multiple physical injuries, including damages to disc' in his back and a sprain to his back.

123.    As a result of defendants Fanderio,Nick, Bobby, and Kevin's deliberate callous disregard for Mr. Rodriguez safty, health, and established constitutional rights, Mr. Rodriguez also suffered further unwanted pain, mental anguish, and his condition grew worse, as a result of their conduct in forcing him to lift heavy objects, after knowing that he had injuries and was medically excused from lifting heavy objects.

124.    As a result of the foregoing, Defendants Fanderio,Nick, Bobby, and Kevin violated Mr. Rodriguez constitutional and civil

18.

rights, as enumerated under both constitutions for the United States and the State of New York, thus subject to redress under 42 U.S.C. §§ 1983, 1985 and 1986.

125.   As a result of the foregoing, Mr. Rodruguez has suffered damages in an amount to be determined by a jury.

## AS AND FOR A FOURTH CAUSE OF ACTION

126.   Plaintiff repeats and realleges each and every allegtion as set forth in paragraphs 1 through 125 above, as if they were more full restated herein.

127.   Defendants Goord, Eagen, and Dean, exercised deliberate indifference to Mr. Rodrguez health and safty, when they failed, after being notified personally by Mr. Rodriguez through written communications of the threats to his health and safty, injuries he had suffered at the hands of individuals under their authority, direction, and/or control, and denial of medical care, to take any reasonable steps as required by law and under the constitutions to intervien and provide a corrective process to ensure future care, safty, and protection for Mr. Rodrguez well being and civil and constitutional rights.

128.   As a result of the deliberate and callous indifference to Mr. Rodriguez rights, and refusal to take reasonable steps as required by established law to protect his safty and health, all done wilfully, voluntarily, and intelligently, caused Mr. Rodriguez to suffer further unwanted pain, mental anguish, and allowed his medical physical condition to grow worse without being provided adequate medical care.

19.

129.    As a result of the foregoing, Defendants Goord, Eagen, and Dean, being on a day to day basis communication with Defendants Kevin, Bobby, Nick, Fanderio, Mara, Destito, Burdick, and John and Jane Does, violated Mr. Rodriguez constitutional and civil rights, as enumerated under both constitutions for the United States and the State of New York, thus subject to redress under 42 U.S.C. §§ 1983, 1985 and 1986.

130.    As a result of the foregoing, Mr. Rodriguez has suffered damages in an amount to be determined by a jury.

## AS AND FOR A FIFTH CAUSE OF ACTION

131.    Plaintiff repeats and realleges each and every allegation as set forth in paragraphs 1 through 130 above, as if they were more fully restated herein.

132.    The above acts by the defendants were done wilfully, intentionally, and voluntarily, with deliberate and callous indifference to Mr. Rodriguez rights.

133.    The above acts by the defendants caused Mr. Rodriguez serious permenent physical injuries, unwanted pain and suffering, and mental anguish.

134.    The above acts by the defendants have caused Mr. Rodriguez to suffer a personal stigma to his life, as he is no longer, due to the injuries, permitted to enjoy physical life activities that he once did before being injured as a result of the defendants failure's to take reasonable steps to provide him with care, safty, and training.

135.    Therefore, the defendants are liable to Mr. Rodriguez for violations of his civil and constitutional rights under the doctrine enunicated by the United States Supreme Court in Bivens v.

20.

Six Unarmed Federal Narcotics Agents, 403 U.S. 388 (1971).

136.   As a result of the foregoing, Mr. Rodriguez has suffered mental distress, interference with his lifestyle, a permement personal stigma, together with loss of privileges, physical permement injuries, and a pysical condition that continues to grow worse due to their failures to take reasonable steps as established by law, to provide adequate care to reduce any further injuries.

137.   As a result of the foregoing, Mr. Rodriguez has been damaged in an amount to be determined by a jury.

**WHEREFORE**, the Plaintiff demands judgment ordering, adjudging and declaring that;

A)   Plaintiff be awarded compensatory and punitive damages against Doctor Mara, Nurse Destito and Nurse Burdick, in each of the First and Second Claims for Relief herein in an amount to be determined by a jury, but for the purposes of this Complaint set in the amount of $500,000.00;

B)   Plaintiff be awarded compensatory and punitive damages against Fanderio,Nick, Bobby, and Kevin, in the Third Claim for Relief herein in an amount to be determined by a jury at trial, but for the purposes of this Complaint set in the amount of $500,000.00;

C)   Plaintiff be awarded compensatory and punitive damages against Goord, Eagen, and Dean, in the Fourth Claim for Relief herein in an amount to be determined by a jury at trial, but for the purposes of this Complaint set in the amount of $500,000.00;

D)    Plaintiff be awarded compensatory and punitive damages against Defendants Mara, Destito, Burdick, Fanderio, Nick, Bobby, Kevin, Goord, Dean, and John and Jane Does One through Twenty-five, on the <u>Bivens</u> claim, the Fifth Claim for Relief, in an amount to be determined by a jury trial, but for the purposes of this Complaint in the amount of $5,000,000.00.;

E)    Plaintiff be awarded the costs of this action with reasonable attorney's fees; and

F)    That the Court grant such other and further relief as the Court deems just.

DATED:  03-22-04
        Rome, New York

JOSE RODRIGUEZ, Pro se
Plaintiff
Din No.: 02-R-2568
Oneida Correctional Facility
6100 School Road
Rome, New York 13440

## VERIFICATION

I, <u>JOSE RODRIGUEZ</u>, hereby attest under the penalty of perjury that the foregoing statements, averments, and/or representations are true and correct to the best of my knowledge and belief. 28 U.S.C. § 1746; 18 U.S.C. § 1621.

JOSE RODRIGUEZ, pro se
Plaintiff

22.